IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC M. MISKOVITCH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06-1410 |
| | ) | |
| v. | ) | Judge Donetta W. Ambrose |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| LT. HOSTOFFER, et al., | ) | |
| | ) | Doc. Nos. 132, 144, 218 |
| Defendants | ) | |

**REPORT AND RECOMMENDATION**

## I.     **RECOMMENDATION**

It is respectfully recommended that the Motion for Summary filed by the Commonwealth

Defendants (doc. no. 132) be granted, that the Motion for Summary Judgment filed by Defendant

Dr. Petras (doc. no. 218) be denied and that Plaintiff's Cross Motion for Summary Judgment (doc.

no. 144) be denied.

## II.     **REPORT**

On February 2, 2008, Plaintiff, Eric M. Miskovitch, filed a Second Amended Complaint

against 22 Defendants raising allegations concerning incidents that allegedly occurred during his

various periods of incarceration at SCI Graterford, the Westmoreland County Prison, Allegheny

County Jail, and Mayview State Hospital.  Defendants included the following:  John R. Walton,

Warden; Steve Cmar, Deputy Of Security; Lt. Hostoffer; Lt. Lowther; C. O. Rosado; and C.O.

Hutchinson, all of whom were employees of the Westmoreland County Jail (WCJ) during the

relevant time period; Tom Balya, Chairman of the WCJ; Thomas C. Ceraso and Phil Light,

Commissioners for the WCJ; and the WCJ (hereinafter collectively referred together as the WCJ

Defendants); Warden Ramon Rustin, Lt. Luis Leon, Major Donis, Captain Reese, C.O. Worrall,

C.O. Mazzocca, all of whom were employees of the Allegheny County Jail (ACJ) during the relevant time period; and the ACJ (hereinafter collectively referred together as the ACJ Defendants); Dr. Rodriguez, a physician who provided medical services to inmates at the ACJ during the relevant time period; Dr. Lazlo Petras, a physician who provided medical services to persons confined at the Mayview State Hospital; Corrections Officer Keith, an employee of Mayview State Hospital (MSH); David Diguglielmo, Superintendent of SCI Graterford, and MSH (collectively referred to as the Commonwealth Defendants).

This Report and Recommendation concerns the Plaintiff's claims against the Commonwealth Defendants and Dr. Petras. In this regard, on December 29, 2009, Dr. Petras filed a Motion for Summary Judgement (doc. no. 218), a Memorandum in Support (doc. no. 219) and a Concise Statement of Material Facts (doc. no. 221).[1] On December 30, 2009, the Commonwealth Defendants filed a Motion for Summary Judgement (doc. no. 132), a Brief in Support (doc. no. 133) and a Concise Statement of Material Facts (doc. no. 134). On January 19, 2010, Plaintiff filed a Response to the motions for summary judgment filed by the Commonwealth Defendants' and Dr. Petras wherein he dismissed with prejudice his claims against Defendants Mayview Hospital and David Diguglielmo (doc. no. 144, p. 17). Plaintiff filed a supplement to this response on March 8, 2010 (doc. no. 166). The discussion that follows concerns Plaintiff's claims against the remaining Commonwealth Defendant and Dr. Petras.

---

1. Dr. Petras filed his motion and accompanying Memorandum and Statement of Facts under seal with this court and served them on Plaintiff, who received them as evidenced by his responses thereto. The Court was not aware that these documents were not properly made part of the electronic record until recently, which accounts for the later numbering for these documents.

## A. Standard of Review

Pursuant to Fed. R. Civ. P 56(c), summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir. 1999), Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir.1987).

## B. Plaintiff's Claims

Plaintiff, Eric Miskovitch, a citizen of the Commonwealth of Pennsylvania, currently is an inmate at the State Correctional Institution at Camp Hill, Pennsylvania. On or about August 1, 2006 while a patient at Mayview State Hospital, Plaintiff claims that he was threatened by C.O. Keith Manker that if he continued to file grievances Manker would give him medication so that Plaintiff "would not remember his name." On August 1, 2006, Plaintiff filed three grievances, one against Manker because of the threat. Shortly thereafter, Defendant Dr. Petras did prescribe and require that Plaintiff begin receiving the drug Thorazine until he subsequently was transferred from Mayview on August 4, 2006.

## C. Liability under 42 U.S.C. § 1983

Plaintiff seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Plaintiff claims Defendant Manker retaliated against him for filing a grievance by conspiring with Dr. Petras to have him involuntarily medicated with Thorazine. He claims that Dr. Petras did this without sufficient justification and in violation of his constitutional rights. His claims are discussed below.

## D. First Amendment - Conspiracy

Plaintiff claims that Defendant Manker conspired with Dr. Petras to involuntarily medicate him in retaliation for his filing grievances. In order to demonstrate a conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of state law.'" Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d Cir. 1993) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)). Plaintiff has concluded that Defendant Manker conspired with Dr. Petras to violate his rights yet he has failed to evidence any facts showing an agreement or plan formulated and executed by the Defendants to achieve this conspiracy. He simply claims that there must be a conspiracy because he filed his grievances at 12:45, one of which was against Defendant Manker accusing him of threatening Plaintiff that if he filed a grievance, he would be medicated and at 1:30, he was involuntarily

injected with Thorazine.  Plaintiff cannot rely on this completely unsupported claim of conspiracy.  Without a factual showing which gives some substance to the conspiracy claims, Plaintiff's conspiracy claim amounts to nothing more than mere conjecture and bare speculation.  The law is clear that bare allegations of wrongdoing by a defendant, without any substantiating proof of an unlawful agreement, are insufficient to sustain a conspiracy claim.  Gometz v. Culwell, 850 F.2d 461, 464 (8th Cir. 1988) (citations omitted).  Also, to survive a motion for summary judgment, the plaintiff must establish that there is a genuine issue of material fact regarding the question of whether the defendants entered into an illegal conspiracy which caused the plaintiff to suffer a cognizable injury.  Massachusetts School of Law at Andover v.  American Bar Association, 107 F.3d 1026, 1039 (3d Cir.), cert. denied, 522 U.S. 907 (1997).  In other words, to successfully counter Defendants' motions for summary judgment, Plaintiff must provide specific evidence establishing that the Defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose.  Vieux v. East Bay Regional Park Dist., 906 F.2d 1330, 1343 (9th Cir.), cert. denied, 498 U.S. 967 (1990).

Here, Plaintiff has failed to introduce into this record any evidence which shows an agreement or plan formulated and executed by Defendants or anyone else which rises to the level of a conspiracy.  At a minimum, absent some modicum of proof which tends to reveal the existence of an agreement which is designed to deny the constitutional rights of the Plaintiff, he cannot maintain his conspiracy claim.  In sum, Plaintiff's allegations, standing alone, are patently insufficient for a reasonable jury to return a verdict in his favor.  See Schowengerdt v. United States, 944 F.2d 483 (9th Cir. 1991) (allegations in a complaint which are based on inference and speculation cannot defeat a motion for summary judgment on a conspiracy claim), cert. denied,

503 U.S. 951 (1992); <u>D.R., a minor v. Middle Bucks Area Vocational School</u>, 972 F.2d 1364 (3d Cir. 1992) (the plaintiffs failed to show that the defendants engaged in a conspiracy to interfere with the Plaintiffs' civil rights); <u>City of Omaha Betterment Association v. City of Omaha</u>, 883 F.2d 650 (8th Cir. 1989) (evidence was insufficient to support a finding that an employer and a local union conspired to deny an employee a promotion because of her gender); <u>Gometz v. Culwell</u>, 850 F.2d at 464 (summary judgment should have been granted regarding against allegations of a conspiracy purportedly engaged in between prison officials because no credible evidence supported the conspiracy claim); <u>Oatess v. Norris</u>, 431 Pa. Super. 599, 637 A.2d 627 (1994) (an inmate's response to officers' motion for summary judgment in 1983 civil rights action alleging a conspiracy was not sufficient to establish the existence of a genuine issue of material fact).

Moreover, the record evidence does not support Plaintiff's retaliation claim even absent a conspiracy. In this regard, it is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under section 1983. <u>Rauser v. Horn</u>, 241 F.3d 330 (3d Cir. 2001); <u>White v. Napoleon</u>, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. *See* <u>Mt. Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Anderson v. Davila</u>, 125 F.3d 148, 163 (3d Cir. 1997).

With respect to the first factor, it is well settled that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in

substantial part by a desire to punish an individual for the exercise of a constitutional right.  <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-25 (3d Cir. 2000).  Accordingly, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied.  <u>Rauser</u>, 241 F.3d at 333.  Rather, the first requirement a Plaintiff must show is that the conduct which led to the alleged retaliation was constitutionally protected.  *Id.*

The second element requires a prisoner to show that he suffered some "adverse action" at the hands of the prison officials.  A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  *See* <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000).  Adverse actions that are sufficient to support a retaliation claim include filing false misconduct reports, <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, <u>Rauser</u>, 241 F.3d at 333, and placing a prisoner in administrative custody, <u>Allah</u>, 229 F.3d at 225.  The Court

The third factor requires that there be a causal link between the exercise of the constitutional right and the adverse action taken against the prisoner.  <u>Rauser</u>, 241 F.3d at 333-34.  This may be established by evidence of a temporal proximity between the prisoner's protected activity and the defendant's adverse action; however, the timing of the alleged retaliatory action must be suggestive of retaliatory motive.

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors.  <u>Mt. Healthy</u>, 429 U.S. at 287.  "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by

proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

In establishing the elements of a retaliation claim, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted). Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), cert. denied, 516 U.S. 1084 (1996); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Finally, allegations of de minimis acts of retaliation do not state a claim under § 1983. Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001) (holding that a de minimis retaliatory act is outside the ambit of constitutional protection). Using these precepts, the Court will review Plaintiff's claim.

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim. See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); Woods, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct). Plaintiff claims that the retaliation was the result of his filing grievances and complaints against Mayview employees. While the Court is not completely convinced that Plaintiff has a constitutional right to file grievances against hospital employees, it need not make this determination as Defendant Petras has provided

sufficient evidence to show that he would have taken the same action regardless of Plaintiff's actions in filing grievances.[2]

With respect to the second element, the Plaintiff alleges that he was involuntarily medicated with Thorazine. This Court finds that the record shows that Plaintiff has met his burden of showing the second element of a retaliation claim, *i.e.*, that he was subjected to "adverse" action.

The third element of a retaliation claim requires the plaintiff to show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred. Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995). It is Plaintiff's burden to prove that the Defendants were motivated by retaliation. Hannon v. Speck, 1988 WL 131367, at *4 (E. D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted), *aff'd*, 888 F.2d 1380 (3d Cir. 1989) (Table).

With respect to the third factor, the record shows that Plaintiff was involuntarily medicated shortly after filing grievances at MSH. Thus, Plaintiff has provided some evidence establishing a temporal link between his protected activity and Defendants alleged retaliatory actions. *See* Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007) (to show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected

_____

2. Dr. Petras claims that he medicated Plaintiff involuntarily because he was a danger to himself and others. This is sufficient to trump Plaintiff's retaliation claim; however, it is not dispositive as to Plaintiff's due process claims, as discussion *infra*.

activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link"); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) (holding that the temporal proximity between the protected conduct and the alleged retaliatory action must be "unusually suggestive" before the court will infer a causal link) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  Notwithstanding, the record belies his allegation that the protected activity was the substantial motivating factor in the decision to involuntarily medicate him.

Here, the record evidence shows the following.  On July 25, 2006, Plaintiff was involuntarily committed to the Mayview State Hospital Forensic Unit by Court Order dated July 11, 2006 for the purpose of assessing his competency to stand trial on various criminal counts pending in the Court of Common Pleas of Allegheny County (doc. nos. 221-3, pp. 1-2).  On August 1, 2006, Plaintiff's progress reports show that at around 11:55 a.m. he demanded to go change his clothes because they were sweaty.  He was told the hospital runs on routines and schedules and that he could change his clothes after lunch (doc. no. 221-5, p. 3).  After he continued to argue about a specific employee he had been focusing on, he was told that he was not there to talk about staff doing their job; he was there for treatment.  The notes further indicate that "[h]e has been arguing about every little thing today."

During lunch, Plaintiff took either barbeque packets or ketchup packets and put them in his pocket and demanded more from staff.  When he was unable to get more, the threw his lunch tray in the trash can stating, "I guess if you mother f___in' people don't give me the barbeque sauce, I cannot eat my dinner" (doc. no. 221-4, p. 1).  At some point either before or after this incident, Plaintiff stated that he wanted to file grievances (doc. no. 221-5, p. 4).  In particular, Plaintiff wanted to complain that the newspaper, which supposedly was for the patients, was "used" by the staff first

and that they routinely took sections out of it, such as the crossword puzzle, before giving it to the patients. When Plaintiff was told that all materials had to be inspected by the staff before going out to the unit, he became loud and stated "Now I'm getting angry." (Doc. No. 221-5, p. 4). Some time after the cafeteria incident, Dr. Petras was contacted so that he could evaluate Plaintiff.

During the evaluation, Dr. Petras claims that Plaintiff's behavior began to escalate and he began cursing about the staff with racial overtones. Dr. Petras then recommended Plaintiff take 100 mg Thorazine orally. Plaintiff agreed and Dr. Petras then left. Shortly thereafter, staff informed Dr. Petras that Plaintiff forced himself to regurgitate the Thorazine. At that point, Plaintiff was brought back in the room with Dr. Petras where, at approximately 1:30 p.m., Dr. Petras ordered that Plaintiff receive an injection of Thorazine 100 mg IM (intramuscular). Afterwards, Plaintiff became combative, started spitting, biting, kicking and fighting staff asserting that he did not want to be medicated with Thorazine. While he was in a side room, he demanded to leave and when he was unable to leave, he grabbed a piece of plastic and started rubbing it against his wrist threatening to kill himself if he was not immediately returned to jail (doc. no. 221-4, p. 2). The Progress notes further provide that, at some point in time, he punched a wall with his left hand (doc. no. 221-5, p. 5).

At 1:50 p.m., he was evaluated by a second psychiatrist (doc. no. 221-6, p. 1).

> . . . Patient evaluated along with Dr. Petras, during evaluation, patient started to escalate, exhibiting threatening behavior, cursing, loud and intrusive. Not responding to verbal intervention. Patient offered Thorazine 100 mg orally, which patient spit up as witnessed by staff. Patient is continuing to escalate, threatening and as patient is a danger to self and others and not responding to less restrictive interventions, patient would benefit from Thorazine I.M.

Doc. No. 221-6, p. 1. Thereafter he was treated with Thorazine, Depakene, a mood stabilization drug as well as Ativan, a mild tranquilizer.

Plaintiff has not submitted any evidence to refute the accuracy of his medical records. These records show that it was Dr. Petras' decision to medicate Plaintiff with Thorazine and that he did so because he determined that Plaintiff was a danger to himself as well as others. The fact that Plaintiff filed grievances during this same time period does not negate the fact that it was Dr. Petras' decision to involuntarily medicate him due his perception that Plaintiff was a danger to himself or others. As Defendants have met their burden of showing that they would have taken the same actions regardless of the protected conduct, they are entitled to summary judgment as to Plaintiff's retaliation claim.

### E. Eighth Amendment

Plaintiff further asserts liability against Defendants Manker and Dr. Petras under the Eighth and Fourteenth Amendments. The Eighth Amendment, as applied to the states through the Fourteenth Amendment, protects individuals against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements: 1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 439 U.S. 897 (1978). The first showing requires the court to objectively determine whether the medical

need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

With respect to Plaintiff's claims of inadequate medical treatment, liability can be assessed only against persons with authority to make treatment decisions concerning Plaintiff's medical care. *See* Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004) (holding that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference). The record evidence shows that Plaintiff was under the supervision of medical personnel during the entire relevant time period. Defendant Manker did not have any ability to make decisions regarding Plaintiff's medical care. Moreover, there is no record evidence that Defendant Manker interfered with Plaintiff's prescribed medical treatment for non-medical reasons. Consequently, Defendant Manker can not be held to have been deliberately indifferent to Plaintiff's medical needs. *Accord* McAleese v. Owens, 770 F.Supp. 255 (M. D. Pa.

1991) (finding that healthcare administrator was entitled to summary judgement because he was not a physician and was unable to assess the reasonableness of the plaintiff's medical treatment).

That leaves Dr. Petras. The parties acknowledge that Plaintiff has demonstrated the existence of a serious medical need. Notwithstanding, Plaintiff has failed to demonstrate that Defendant Petras acted with deliberate indifference to his condition. The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." *Id.* Moreover, deliberate indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment. Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 429 U.S. 97, 104 (1978). In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck. He went to the unit hospital where a medical assistant checked him for a hernia and sent him back to his cell. He returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed a pain reliever and a muscle

relaxant.  Over the course of several weeks, Gamble was seen by several doctors who prescribed

various pain relievers and provided him with medical work excuses.  Ultimately, despite his protests

that his back hurt as much as it had the first day, medical staff certified Gamble to be capable of light

work.  During the next two months, Gamble received a urinalysis, blood test, blood pressure

measurement, and pain and blood pressure medication.  Subsequently, a medical assistant examined

Gamble and ordered him hospitalized for treatment of irregular cardiac rhythm.

The Supreme Court held that Gamble's allegations failed to state a claim upon which relief

could be granted against the defendant, both in his capacity as a treating physician and as the

medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a
> 3-month period . . ..  They treated his back injury, high blood
> pressure, and heart problems. Gamble has disclaimed any objection
> to the treatment provided for his high blood pressure and his heart
> problem; his complaint is "based solely on the lack of diagnosis and
> inadequate treatment of his back injury."  The doctors diagnosed his
> injury as a lower back strain and treated it with bed rest, muscle
> relaxants and pain relievers.  Respondent contends that more should
> have been done by way of diagnosis and treatment, and suggests a
> number of options that were not pursued.  The Court of Appeals
> agreed, stating:  "Certainly an x-ray of (Gamble's) lower back might
> have been in order and other tests conducted that would have led to
> appropriate diagnosis and treatment for the daily pain and suffering
> he was experiencing."  But the question whether an X-ray or
> additional diagnostic techniques or forms of treatment is indicated is
> a classic example of a matter for medical judgment. A medical
> decision not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment. At most it is medical malpractice, and
> as such the proper forum is the state court under the Texas Tort
> Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted) (emphasis added).

Like the prisoner in Gamble, Plaintiff at bar has failed to demonstrate that he suffered a

constitutional violation, a prerequisite for recovery under 42 U.S.C. § 1983.  Plaintiff's medical

records at Mayview indicate that he received extensive medical treatment albeit some that he did not agree to.  While an intentional refusal to provide <u>any</u> medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.[3]  A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." <u>Layne v. Vinzant</u>, 657 F.2d 468, 473 (1st Cir. 1981).  Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness. <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990) (citations omitted).  *Accord* <u>Young v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not state claim for relief under section 1983).

To survive Defendants' motions for summary judgment, Plaintiff is required to point to some evidence to show that Defendants knew or were aware of a substantial risk of serious harm. <u>Singletary v. Pennsylvania Dept. of Corrections</u>, 266 F.3d 186, 192 n.2 (3d Cir. 2001)). Specifically, there is no record evidence that suggests that any Defendant knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures

---

3  *See, e.g.*, <u>Dias v. Vose</u>, 960 F.2d 143 (1st Cir. 1991); <u>United States v. DeCologero</u>, 821 F.2d 39, 42 (1st Cir. 1987) ("though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy"); <u>Ferranti v. Moran</u>, 618 F.2d 888, 891 (1st Cir. 1980) (a dispute over the exercise of professional medical judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation); <u>Layne v. Vinzant</u>, 657 F.2d 468, 474 (1st Cir. 1981) (where the dispute is over the adequacy of the medical treatment, federal courts should be reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law).

to abate it or that he had any reason to know that he faced any substantial harm. Moreover, Plaintiff has failed to demonstrate that he suffered any harm as a result of Defendants' actions. Thus, Defendants are entitled to summary judgment as to Plaintiff's claims alleging inadequate medical treatment.

### F. Fourteenth Amendment

Plaintiff asserts several due process violations in his Complaint. The Due Process Clause of the Fourteenth Amendment provides as follows.

> Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, §1 (emphasis added).

Three kinds of section 1983 claims may be brought under the Due Process Clause of the Fourteenth Amendment. Zinermon v. Burch, 494 U.S. 113, 125 (1990). First, a plaintiff may bring suit under section 1983 for a violation of his specific rights as guaranteed by the Bill of Rights. *Id*. Second, a plaintiff may assert a Fourteenth Amendment claim under the "procedural" aspect of the Due Process Clause, which guarantees fair procedure for the deprivation of a constitutionally-protected interest in life, liberty or property. *Id*. Third, a plaintiff may assert a claim under the "substantive" prong of the Due Process Clause, which bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. *Id*. (quoting Daniels v. Williams, 474 U.S. at 331)).

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. Meachum v. Fano, 427 U.S. 215, 224 (1976). The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a person's existence that qualify as "liberty interests." Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972). The types of protected liberty interests are not unlimited. The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Petitioner's claims is whether Defendant's actions impacted a constitutionally-protected liberty interest. A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation. Hewitt, 459 U.S. at 466. A liberty interest inherent in the Constitution arises when a person has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the person be accorded due process. Gagnon v. Scarpelli, 411 U.S. 778, 781 (1973). Interests recognized by the Supreme Court that fall within this category include the revocation of parole, Morrissey, 408 U.S. at 471, and the revocation of probation, Gagnon, 411 U.S. at 778. Important to the case at bar, is a person's significant liberty interest in avoiding the unwanted administration of antipsychotic drugs that arises under the Due Process Clause of the Fourteenth Amendment.

In this regard, the Court of Appeals for the Third Circuit held in Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981) (Rennie I), that involuntarily committed mentally retarded patients have a

constitutional right to refuse treatment, including antipsychotic drugs. The risk of serious side effects stemming from the administration of antipsychotic drugs was a critical factor in the Court's determination that a liberty interest is infringed by forced medication. Rennie I, 653 F.2d at 843, n.8.[4] At issue in Rennie were the procedures that New Jersey state hospitals were required to follow for forcibly medicating involuntarily committed patients in non-emergency situations as set forth in Administrative Bulletin 78-3 (Rules for Involuntary Administration of Medication) (this policy contains procedures for the administration of medication in both emergency and non-emergency situations). While Rennie I was on appeal, the Supreme Court decided Youngberg v. Romeo, 457 U.S. 307 (1982). Romeo was a section 1983 action for damages in which the plaintiff claimed that as a mentally retarded inmate of Pennhurst, a state institution, his constitutional rights had been violated when he suffered, among other things, attacks on his person and physical restraints. In determining the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded, the Supreme Court adopted the standard announced by Chief Judge Seitz in his Romeo concurrence. In so holding, the Supreme Court held

_____

4. In so holding the Court found that all the antipsychotic drugs induce a variety of disorders of the central nervous system as side effects. Most serious among these is tardive dyskinesia, a potentially permanent disorder. It is characterized by rhythmical, repetitive, involuntary movements of the tongue, face, mouth, or jaw, sometimes accompanied by other bizarre muscular activity. More common, but less serious than tardive dyskinesia, are akinesia and akathesia. The former can induce a state of diminished spontaneity, physical weakness and muscle fatigue. The latter is a subjective state and refers to an inability to be still; a motor restlessness which may produce a shaking of the hands or arms or feet or an irresistable desire to keep walking or tapping the feet. Both of these disorders usually disappear either during or shortly after the course of medication. They can sometimes be controlled by anticholinergic or antiparkinsonian medications. A variety of minor physical effects also attend the use of antipsychotics, which include blurred vision, dry mouth and throat, constipation or diarrhea, palpitations, skin rashes, low blood pressure, faintness and fatigue. These side effects tend to diminish after a few weeks.. In rare cases the antipsychotic drugs have caused death. Rennie I, 653 F.2d at 843-44.

that the standard for determining damage recovery for mentally retarded patients against doctors and other professionals turns on whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. at 323. The Supreme Court declined to adopt the "least intrusive means" analysis set forth in <u>Rennie I</u> and remanded it to the Court of Appeals for further consideration in light of <u>Youngberg v. Romeo</u>.

Upon reconsideration in <u>Rennie v. Klein</u>, 720 F.2d 266 (3d Cir. 1983) (<u>Rennie II</u>), the Court of Appeals affirmed its holding in <u>Rennie I</u>, that involuntarily committed mentally retarded patients have a constitutional right to refuse antipsychotic drugs but rejected its "least intrusive means" analysis. The non-emergency procedure for allowing involuntary medication at issue in <u>Rennie</u> consisted of three levels of approval before patients may be forcibly medicated. First, the treating physician must meet with the patient in an attempt to address his concerns. If the patient persists in refusing medication and the physician believes that medication is a necessary part of the patient's treatment, then the matter is referred to a treatment team. Second, the treatment team reviews the physician's recommendation and the patient's objections, and then documents its conclusions. If the patient is present, the team must attempt to formulate a treatment plan acceptable to the patient and the team. Third, if the patient still persists in refusing medication, then the Medical Director must conduct a personal examination of the patient. If the Medical Director agrees with the treating physician, then the medication may be administered forcibly. Throughout this process, the patient may consult with an independent hospital staff member known as a "Rennie Advocate." The Court of Appeals for the Third Circuit determined that these procedures struck a constitutionally appropriate balance by protecting the patient's liberty interest in refusing medication while still

allowing medical authorities to administer medication as needed.  Rennie II, 720 F.2d at 269-270.

In applying the Romeo standard to the facts at bar, the Court of Appeals specifically held that "[o]ne

of the factors to be considered in the exercise of professional judgment--albeit not a controlling or

necessarily determinative factor--is whether and to what extent the patient will suffer harmful side

effects."  Rennie II at 269.

In 1990, the Supreme Court was confronted with the constitutionality of procedures

established by the Special Offender Center (SOP), a correctional institution established by the

Washington Department of Corrections for the treatment of inmates with serious mental disorders.

See Washington v. Harper, 494 U.S. 210, 222 (1990).  Specifically at issue was Policy 600.30

concerning involuntary treatment.  Under this policy, if a psychiatrist determines that an inmate

should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be

subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder" and

(2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property.

An inmate who refuses to take the medication voluntarily is entitled to a hearing before a special

committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the

Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or

diagnosis.  If the committee determines by a majority vote that the inmate suffers from a mental

disorder and is gravely disabled or dangerous, the inmate may be medicated against his will,

provided the psychiatrist is in the majority.  Harper, 494 U.S. at 215. The inmate is entitled to notice

of the hearing, the right to attend, present evidence, and cross-examine witnesses, the right to

representation by a disinterested lay adviser versed in the psychological issues, the right to appeal

to the Center's Superintendent, and the right to periodic review of any involuntary medication

ordered. In addition, state law provided him the right to state-court review of the committee's decision.

Harper argued that he had a liberty interest to refuse antipsychotic drugs which the state could not override unless he was found to be incompetent and that, if he was competent, he would agree to such treatment. In analyzing this claim, the Court noted that the extent of a prisoner's right to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement. Harper, 494 at 222. The Court found that the policy, which required that the medication first be approved by a psychiatrist and then approved by a reviewing committee ensured that the treatment in question would be ordered only when it was in the prisoner's medical interests given the legitimate needs of the institution. Thus, the Court held that the policy met the substantive standards of the Due Process Clause.

Next, the Court evaluated the procedures at issue to determine if the procedural protections of the Due Process Clause were met. The Policy required that the decision to involuntarily medicate be made by a hearing committee composed of a psychiatrist, a psychologist, and the Center's Associate Superintendent. None of the committee members could be involved in the inmate's treatment or diagnosis at the time of the hearing. The committee's decision was subject to review by the Superintendent and the inmate could seek judicial review of the decision in state court.

Harper argued that the decision to involuntarily medicate could not be made absent a judicial hearing. The Supreme Court disagreed and held that the Due Process Clause does not require a judicial hearing. In so concluding, the Court utilized the balancing factors set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), to evaluate the sufficiency of the particular procedures in determining what process was due. In Mathews, the Court held that the requirements of due process,

which are flexible and should be tailored to the situation, requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

Under the first factor, the Court found that "[t]he forcible injection of medication into a non-consenting person's body represents a substantial interference with that person's liberty." Harper, 494 U.S. at 229. Second, the court found that an inmate's interests were adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge. Id. at 230. Finally, under the third factor, the Court found that requiring judicial hearings would divert scarce prison resources from the care and treatment of mentally ill inmates. Id. at 232. The Court found that the policy providing for notice, the right to be present at an adversary hearing, the right to present and cross-examine witnesses, together with the right to obtain judicial review of the hearing committee's decision by way of a personal restraint petition or petition for an extraordinary writ comported with the procedural requirements of the Due Process Clause. Harper, 494 U.S. at 233. Thus, the Court concluded that the policy's accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others did not violate the Due Process Clause.

In Riggins v. Nevada, 504 U.S. 127, 134 (1992), the Court was confronted with the issue concerning what rights are due a criminal defendant with respect to forced administration of an antipsychotic drug, Mallaril, to make him competent to stand trial. In this case, the defendant argued that the State intruded upon his constitutionally protected liberty interest in freedom from antipsychotic drugs without considering less intrusive options. Assuming that the administration of Mellaril was medically appropriate, the Supreme Court analyzed his claims as follows. First, the Court noted that the Fourteenth Amendment affords at least as much protection to pre-trial detainees as those convicted of crimes and, "[u]nder Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." Riggins, 504 U.S. at 135. The Court held that the Constitution permits the Government involuntarily to administer antipsychotic drugs to render a mentally ill defendant competent to stand trial on serious criminal charges if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the trial's fairness, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests. Id. Because the trial court had permitted forced medication of Riggins without taking account of his "liberty interest," with a consequent possibility of trial prejudice, the Court reversed his conviction and remanded for further proceedings.

The Supreme Court revisited this issue in Sell v. United States, 539 U.S. 166 (2003). In Sell, the Supreme Court explicitly allowed the forcible medication of an inmate "solely for trial competence purposes" in certain "rare" instances. Sell, 539 U.S. at 180. In so holding, the Court set forth a standard that the government must meet in order to overcome the inmate's liberty interest, as laid out in a four-factor test. First, "a court must find that important governmental interests are

at stake," though "[s]pecial circumstances may lessen the importance of that interest." *Id*. Second, "the court must conclude that involuntary medication will significantly further those concomitant state interests." *Id*. at 181. This includes finding that "administration of the drugs is substantially likely to render the defendant competent to stand trial," and "[a]t the same time, ... that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id*. Third, "the court must conclude that involuntary medication is necessary to further those interests" and that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id*. Fourth, "the court must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id*. The Court then emphasized that the goal of this test is "to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial." *Id*. All courts of appeals, including the Court of Appeals for the Third Circuit, have determined that the Government bears the burden of proof on the factual questions presented in the four part inquiry by clear and convincing evidence. *See, e.g.*, United States v. Grape, 549 F.3d 591, 598 -599 (3d Cir. 2008) (citing United States v. Gomes, 387 F.3d 157, 159 (2d Cir. 2004) (applying and requiring the Government to meet the "clear and convincing evidence" standard previously articulated in Riggins v. Nevada, 504 U.S. 127, 134 (1992), as to the factual findings in Sell factors two through four)).

In his motion for summary judgment, Defendant Petras argues that he is not liable because his decision to medicate Plaintiff with Thorazine was: 1) consistent with the Court order committing him; 2) clinically appropriate; and 3) made only after consultation with another psychiatric

colleague. First, while the Court order contained language allowing Plaintiff to be medicated, it does not, nor could it, have provided Dr. Petras *carte blanche* authority to involuntarily medicate Plaintiff. As the discussion above clearly shows, Plaintiff has a significant liberty interest inherent in the Due Process Clause in avoiding the forced administration of psychotropic medication. Such judicial order, standing alone, does not negate Plaintiff's due process rights. Second, the fact that medication with Thorazine may have been "clinically appropriate" does not answer the question of whether Plaintiff was denied his right to substantive and procedural due process. And third, Dr. Petras medicated Plaintiff with Thorazine *before* he consulted with a second physician in what appears to be an attempt to justify his earlier action. None of these factors satisfy Petras' burden of showing that he is entitled to summary judgment on the record before this Court.

First, the law set forth above makes clear that, at least after the Supreme Court decided Washington v. Harper in 1990, a person is entitled to procedural and substantive safeguards inherent in the Due Process Clause before he can be forcibly administered antipsychotic medications. To this end, in 1992, in response to Washington v. Harper, the Justice Department, Bureau of Prisons, established an administrative procedure for delivering involuntary psychiatric treatment and medication. 28 CFR § 549.43. This regulation provides for notice, an administrative hearing, adjudication by a psychiatrist not involved in treating the inmate and the right to have a staff representative of the inmate. When a patient refuses psychotropic medication at a Federal Medical Center, in the absence of an emergency, the administrative hearing process is instituted. 28 CFR § 549.43(a). At that hearing, the patient will have a staff representative who can assist in questioning witnesses, and confer with the patient concerning voluntary administration of an anti-psychotic drug. The psychiatrist conducting the hearing shall determine whether treatment or

psychotropic medication is necessary in order to attempt to make the inmate competent for trial or is necessary because the inmate is dangerous to self or others, is gravely disabled, or is unable to function in the open population of mental health referral center or a regular prison. The psychiatrist shall prepare a written report regarding the decision. 28 CFR § 549.43(a)(6).

The regulation specifically exempts "emergencies" from the hearing process and defines such as follows.

> (b) Emergencies. For purpose of this subpart, a psychiatric emergency is defined as one in which a person is suffering from a mental illness which creates an immediate threat of bodily harm to self or others, serious destruction of property, or extreme deterioration of functioning secondary to psychiatric illness. During a psychiatric emergency, psychotropic medication may be administered when the medication constitutes an appropriate treatment for the mental illness and less restrictive alternatives (e.g., seclusion or physical restraint) are not available or indicated, or would not be effective.

28 CFR § 549.43(b).

Defendant appears to argue that his actions were justified because Plaintiff's actions demonstrated that he was in danger of hurting himself or others, *i.e.,* there was an emergent situation that justified the failure to provide any due process procedures prior to forcibly medicating Plaintiff. Of grave concern to this Court in adjudicating this action is the lack of any policy or procedure followed by staff at MSH concerning involuntary treatment. Specifically, Defendant has provided no guidance utilized by MSH employees with respect to emergency treatment or non-emergency treatment with psychotropic medication. This is troubling in light of the wealth of law set forth above clearly demonstrating a patient's due process right not to be involuntarily medicated. Further, Defendant relies on case law that simply are not dispositive of the issues at bar in the current action.

For example, Defendant cites to <u>Benn v. Universal Health Sys., Inc.</u>, 371 F.3d 165, 175 (3d Cir. 2004) for the proposition that "authorities may administer antipsychotic drugs over a patient's objection where the decision is a product of the authorities' professional judgment. <u>Benn</u> clearly does not stand for that proposition. In that case, the Plaintiff argued that his substantive due process rights were violated when he was forcibly given antipsychotic medication. Citing to pre-<u>Harper</u> decisions, the Court of Appeals for the Third Circuit concluded that the administration of antipsychotic drugs is not shocking to the conscience under the circumstances presented because the Plaintiff did not allege that he objected to the administration of the medication. <u>Benn</u>, 371 F.3d at 175. That is not the situation presented in the case before this court. Nor is another case cited by Petras applicable authority to the issues presented. *See* <u>Laufgas v. Speziale</u> Civil No. 04-1697, 2006 WL 2806318, 2 (D.N.J. Sept. 28, 2006) ("In this case, plaintiff was never forced to take antipsychotic drugs, as his evaluation found such treatment to be unnecessary.")

In fact, the only case cited by Petras that is even marginally useful in considering Plaintiff's claims is <u>Lewis v. Foster</u>, Civil No. 04-1350, 2008 WL 4224609, 1 (D. Del. Sept. 16, 2008).[5] That case, like Plaintiff's, occurred while Lewis, a pre-trial detainee was confined to the Delaware Psychiatric Center (DPC) pursuant to a court order for the purpose of determining competency and to obtain treatment for his own well-being. Lewis was admitted to the DPC on May 21, 2004, and discharged on June 25, 2004. Upon arrival, Lewis was to undergo an admission interview but he refused to communicate with the staff and would not answer any questions. His records noted that in 2003, Lewis had been evaluated by a prison psychiatrist as "psychotic and delusional, a danger

_____

5. Defendant relies on this District of Delaware case while claiming that the District of New Jersey case cited by Plaintiff (discussed *infra*), "is, of course, not controlling on this Court."

to self and others, refuses to take medication." At that time, the interviewing psychologist, Dr. Foster, ordered medication to be administered if the situation demanded. The medications included Haldol, a high-potency antipsychotic indicated for psychotic disorders and Tourette's Syndrome, Benadryl and Ativan. On May 23, June 3, and 4, 2004, Lewis was noted wearing horns on his head in an attempt to frighten the other patients. On June 13 and 14, 2004, Lewis was aggressive and inappropriate toward the DPC staff. On June 6, and 21, Lewis punched or hit other patients and on June 24, 2004, he threw his lunch tray and another patient's tray against the wall. In response to Lewis' conduct, he was either placed in the seclusion room or into four (4) point restraints and administered the PRN medications. In granting Dr. Foster's motion for summary judgment, the Court found that the medical records indicated that each time Lewis was involuntarily medicated it was during an emergency situation and due to Lewis' agitation, aggression, and combative behavior towards staff and patients. The Court made this determination after citing <u>Benn v. Universal Health Sys., Inc.</u>, 371 F.3d 165, 175 (3d Cir.2004) for the proposition that "authorities may administer antipsychotic drugs over a patient's objection where the decision is a product of the authorities' professional judgment." As stated above, <u>Benn</u> does not so hold.

Moreover, the facts in <u>Lewis</u> are much different than those presented here. Plaintiff's records show that his initial evaluation revealed no cognitive defects and no thought disorder (doc. no. 221-4, p. 1). On July 25, 2006, his records show that he was cooperative during his evaluation and no behavior problems were noted (doc. no. 166-1, p. 17). On July 26, 2006, his chart specifically notes "no behavioral problems thus far-conversations are goal oriented/rational and no evidence of depressed mood" (doc. no. 166-1, p. 18). That same day, he completed a spiritual assessment. In July 27, 2006, his notes indicate that he was cooperative, took meds as prescribed

and "no problems at present" (doc. no. 166-1, p. 18). On July 28, 2006, he cooperated in completing an initial psychological assessment "no aggressive behavior" was noted (doc. no. 1661-, p. 19). On July 29, 2006, his records provide "Eric continues to watch the FSE's and mumble insults underneath his breath where staff is redirecting other patients. He is showing no overt signs of psychosis nor depression as affect is bright and his conversations are goal oriented/rational" (doc. no. 166-1, p. 19). On July 30, 2006, he was found to be cooperative and interacting appropriately with staff (doc. no. 166-1, p. 20). On July 31, 2006, he was found to be cooperative, took AM meds, interacting with select peers and "no problems at present" (doc. no. 1661-, p. 21). Also on that date, he completed a Forensic Therapeutic Activity Assessment (doc. no. 166-1, p. 15) and Therapeutic Recreation Assessment (doc. no. 166-1, p. 16).

On August 1, 2006, his 9:00 a.m. notes show that he took his medications, had no overt sign of psychosis or depression and completed a Social Service Assessment (doc. no. 166-1, p. 21). The next notation is for 12:45 p.m. and provides as follows.

> Eric was observed calling staff names because he wanted to change his clothes when he wanted to. He has been here for a week and claims he doesn't know the policy. He approached female FSE demanding to change his clothes. FSE explained the rules/routine but he continued to argue about another FSE whom he has been focusing on. I reminded Eric that he was not here to talk about staff doing their job and that he was here for treatment. He has been arguing about every little thing today. He actually took his underwear off and was drying them by the fan after staff told him that room was opened after lunch. He then returned from lunch to argue with me about lunch. he then stated "I want to file grievances" "The paper is in the office and its for the patients" I reminded him that staff has to check everything prior to it going out on the unit and he became loud and stated "Now I'm getting angry." Will continue to observe.

Doc. No. 166-1, p. 28.

The next notation is for 1:00 P.M. and provides as follows.

Eric approached staff in the dayroom and directly addressed me after by-passing male staff. He stated to me "I'm going to bother you." I asked him what he needed. He told me he wanted to change his clothes because he was sweaty. At the time it was about 11:55 am and we were going to be going to lunch @ noon. I informed him we would be doing day rooms after lunch and that was the time for him to change his clothes. He asked "why can't I change my clothes now? I again explained that room time was the time for that. In an angry tone he stated "fine. If you want to smell my sweat then you can smell my sweat,.it doesn't bother me. You would have let me in my room if it wasn't for that other FSE telling you not to." I explained to him that my decision was based on the fact I was following the rules concerning room time not what another FSE said. He stated "Oh. I didn't know what the rule was." Then very tersely he said "thank you have a nice day" and turned walked away.

Doc. No. 144-8, p. 1.

The next notation in his records is dated 2:30 p.m. and provides that at approximately 1:15 pm, Eric was talking to Dr. Petras, who had been called in response to a lunch incident where Plaintiff had pocketed some barbeque sauce or ketchup packs and when his request for more was declined, angrily threw his tray in the trash and used profanity. According to Dr. Petras, Plaintiff began screaming and using racial overtures and when he refused to calm down, Dr. Petras ordered him to take 100 mg Thorazine by mouth (doc. no. 144-8, p. 1). Plaintiff agreed but walked out of the office and regurgitated the medication at approximately 1:25. At 1:30 pm, Dr. Petras ordered Plaintiff to be medicated with 100 mg Thorazine intramuscularly. Plaintiff specifically denies being violent, threatening or assaultive prior to being given Thorazine. After he was involuntarily medicated, however, he punched the wall with his left hand claiming that the doctor made him angry (doc. no. 144-8, p. 1). He claims that he was continued on Thorazine until he was released back to the ACJ three days later.

The evidence outlined above reveals that there is a substantial question of fact whether Plaintiff's condition at the time he was involuntarily medicated constituted an "emergency" sufficient to have allowed him to be involuntarily medicated without any due process procedures whatsoever. As stated above, the federal government has promulgated a regulation requiring "Harper hearings" which are to be employed in the case of dangerousness before considering involuntary medication orders. *See, e.g.*, United States v. Grape, 549 F.3d 591, 598 -599 (3d Cir. 2008); United States v. Fabela, 666 F.Supp.2d 1082, 1090 (D. Ariz. 2009); United States v. Rivera-Guerrero, 426 F.3d 1130, 1137 (9th Cir. 2005); United States v. Grape, Criminal No. 05-33-Erie, 2010 WL 441121 (W.D. Pa. Feb. 4, 2010). Although this regulation has an "emergency" exemption, it is narrowly tailored as one in which "a person is suffering from a mental illness which creates an immediate threat of bodily harm to self or others, serious destruction of property, or extreme deterioration of functioning secondary to psychiatric illness." 28 C.F.R. § 549.43(b). Moreover, during a psychiatric emergency, psychotropic medication may be administered only when the medication constitutes an appropriate treatment for the mental illness and less restrictive alternatives (e.g., seclusion or physical restraint) are not available or indicated, or would not be effective. There is no dispute that no such alternatives were considered in Plaintiff's case. While Plaintiff may have appeared to have been dangerous to Dr. Petras, that fact alone does not support a finding that an "emergency" existed such as to trump Plaintiff's due process rights. The record evidence shows that Dr. Petras spent less than fifteen minutes with Plaintiff before ordering him to take Thorazine orally and then forcing him to have an IM injection less than five minutes later. Further, it appears that Plaintiff was medicated against his will for three days after the event in question.

Defendant argues that Defendant Petras is not liable because he used professional judgment in treating Plaintiff and has attached an expert report in support of his assertion.  But medical necessity or appropriateness simply is not the appropriate standard for a due process claim.  *See* Riggins, 504 U.S. at 133 ("We also presume that administration of Mellaril was medically appropriate."). [6] Rather, the appropriate inquiry is as follows.

> Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?

Sell, 539 U.S. at 183.

As Plaintiff claims, his case is very similar to that presented in Brandt v. Monte, 626 F.Supp.2d 469 (D.N.J. 2009) where an involuntarily committed health patient brought a civil rights action against hospital staff and state officials alleging violation of his constitutional rights by forcibly administering antipsychotic medication.  Defendant seeks to limit my reliance on Brandt claiming that the Court denied summary judgment in that case because the plaintiff set forth specific facts to dispute the defendants' claim that Plaintiff was "medicated properly."  Here, Defendant claims Plaintiff has no expert support and has presented no deposition testimony other than his own.  As Plaintiff points out, he is an incarcerated *pro se* Plaintiff with no means or access to get an expert or take depositions.  Thus, Defendant's basis for my rejection of Brandt is improper in this instance.

---

6.  Plaintiff is not seeking to impose liability against Dr. Petras under Pennsylvania state law; he is claiming violations of his Due Process Rights as he makes clear in his pleadings (see doc. nos. 144 and 166).  While this Court agrees that he has not stated a retaliation claim against Dr. Petras, he has submitted sufficient evidence to state a claim for a violation of his Due Process rights.

In Brandt, the Court was confronted with the constitutionality of the emergency procedures for forcible administration of antipsychotic medication in New Jersey, which was not at issue and, therefore, unresolved in Rennie I and Rennie II. Like Mr. Miskovitch, the plaintiff in Brandt had a long history of psychological illness, which, at times, had manifested itself in violent and unlawful behavior. In 2003, Brandt was found not guilty by reason of insanity for criminal charges of burglary, criminal mischief, and criminal trespass and thereafter was involuntarily committed at Ancora, a psychiatric hospital. In February of 2006, a state commitment court ordered that his treatment team begin a discharge plan if deemed appropriate and that he cooperate with his treatment team and take any medications prescribed by the treating psychiatrist. Sometime thereafter, he was transferred to Holly Hall C and placed under the care of the ward psychiatrist, Defendant Monte. The morning he was transferred, he met with Monte and the treatment team for a routine intake interview, at which time Monte prescribed antipsychotic medication. Plaintiff believed he did not need antipsychotic medication and refused to consent to administration of the drugs. In the treatment team meeting, Plaintiff grew increasingly agitated. He raised his voice, and at one point left the room. After the meeting's abrupt conclusion, Monte completed a certificate that declared Plaintiff to be an "emergency" and ordered that he be medicated intravenously without his consent. On the "Emergency Certificate," she provided this basis for the emergency declaration:

> HOSTILE, AGGRESSIVE, ANGRY, REFUSING TO TAKE MEDS, IMPULSIVE, LONG HX [HISTORY] OF AGGRESSIVE/ASSAULTIVE/CRIMINAL BEHAVIOR, EXTREMELY MANIPULATIVE-- HAS COURT ORDER TO COMPLY WITH PRESCRIBED MEDICATION--VERY CONFRONTATIONAL WITH HIGH LEVEL OF AGITATION AND HOSTILITY--HX [HISTORY] OF 2 ESCAPES FROM GPPH [GREYSTONE PARK PSYCHIATRIC HOSPITAL]--KROL STATUS.

<u>Brandt</u>, 626 F.Supp.2d at 473. In addition to the Emergency Certificate, Monte put Plaintiff on "one-to-one precautions," which required a hospital staff member to be within an arm's length of the patient at all times and to keep a log noting the patient's behavior every fifteen minutes. Medication was administered to Plaintiff pursuant to the Emergency Certificate on two occasions. Because drugs were routinely administered twice daily, at 8:00 a.m. and 8:00 p.m., plaintiff's first emergency administration occurred at 8:00 p.m., almost nine hours after his encounter with Monte; the second emergency administration occurred at 8:00 a.m. the following morning. That morning, Monte initiated the three-step Non-Emergency Procedure for medicating a patient involuntarily. By noon, this procedure had been completed. Thus, starting with the second day's evening administration, Brandt was medicated pursuant to the Non-Emergency Procedure.

At issue in <u>Brandt</u> is the emergency procedures in Administrative Bulletin 78-3, which were not at issue in the Rennie cases.[7] The emergency procedure requires a treating physician to certify "that it is essential to administer psychotropic medication, because without medication there is a substantial likelihood that the patient will harm him/her self or others ... in the reasonably foreseeable future....". <u>Brandt</u>, 626 F.Supp.2d at 474. Once this "Emergency Certificate" is completed, medication may be administered for up to 72 hours. *Id*. The emergency procedure provides a mechanism for some type of review, but does not specify who the reviewing authority must be or whether review is even required. *Id*.

Brandt alleged that the defendants administered medication pursuant to the emergency procedure in the absence of a genuine emergency relying on deposition testimony suggesting that

---

7 The non-emergency procedure, which requires three levels of approval before patients may be forcibly medicated, was found to be constitutionally acceptable in <u>Rennie I</u> and <u>Rennie II</u>.

it was the defendants' routine practice to employ the emergency procedure whenever a patient refused medication and as a means of inducing patient consent during the later-pursued non-emergency procedure. Plaintiff further alleged that the emergency procedure lacked any meaningful procedural safeguards beyond the treating physician's brute declaration of an emergency. Finally, he alleged that, during the non-emergency procedure, his treating physician ordered the administration of medication in violation of professional standards and treatment team members failed to provide independent and impartial oversight. Defendants argued, *inter alia*, that they were entitled to qualified immunity.

The Court then engaged in a detailed analysis of the legal landscape as set forth above noting that, like Defendant in the current action, "[t]hroughout their papers, Defendants construe Rennie as permitting any forcible drug administration, as long as the treating physician has exercised professional judgment. This interpretation of Rennie is untenable, particularly in the aftermath of Harper, Riggins, and Sell." Brandt, 626 F.Supp.2d at 476. Rather, the Court held that Rennie permits medical authorities to forcibly medicate involuntarily committed patients in an emergency, if consistent with accepted professional standards, only to the extent necessary to prevent the patient from endangering himself or others, and undertaken after consideration of available alternatives. Brandt, 626 F.Supp.2d at 478 (citing Rennie II, 720 F.2d at 269-70).

Using this standard, the Court first found that Plaintiff had alleged a violation of his substantive due process rights. First, the Court noted that "before medical authorities may medicate a patient against his will, they must make a predicate determination that the patient was a danger either to himself or others." Brandt, 626 F.Supp.2d at 478 (citing Rennie, 720 F.2d at 270 n. 8; and Harper, 494 U.S. at 227) (holding dangerousness to be a precondition to forced medication)). This

was not done in Brandt's case nor in the case at bar. Second, the Court found that, "even if a patient

does pose a danger, authorities can forcibly administer medication only in the exercise of

professional judgment. If medicating a patient would substantially depart from accepted

professional standards (for example, if isolating the patient momentarily while he calms down, rather

than medicating him, would avert the danger more effectively), then his due process right to refuse

medication has been violated." *Id.* at 479. There is no dispute on this record that Dr. Petras did not

consider any available alternatives, nor weigh the potential side effects before ordering Plaintiff to

take Thorazine during the short interview. Moreover, Dr. Petras left right after the interview thus

casting doubt that there existed a true emergency. Thus, there is a disputed issue of material fact

whether he exercised professional judgment under the circumstances presented and the governing

standard. The <u>Brandt</u> Court's findings are instructive in this regard.

> Whether the Ancora Defendants reasonably perceived a genuine emergency turns on the circumstances they confronted, in particular, what they knew at the time and just how aggravated, erratic, or violent Plaintiff was in his encounter with them. In other words, the legal determination of whether the Ancora Defendants' perception of an emergency was reasonable, is contingent upon a factual determination of what circumstances they actually confronted. At one end of the spectrum, if Plaintiff had been wielding a knife while shouting uncontrollably at the Ancora Defendants, their perception of an emergency would clearly have been reasonable. At the other end of the spectrum, if Plaintiff had been sitting calmly and speaking in a conversational tone while politely expressing his disagreement with the Ancora Defendants' decision to medicate him, no reasonable person in their position would have perceived an emergency. Predictably, however, the actual encounter falls in the gray area between these hypothetical poles.

> When conducting a "totality of the circumstances" analysis, the Court does not necessarily give equal weight to all evidence. In determining what circumstances confronted the Ancora Defendants, the Court is mindful that treatment team members' notes from the day of the incident provide more reliable evidence of their actual

perceptions than does deposition testimony, in which parties often try, retrospectively, to justify their conduct long after the incident. Furthermore, the Ancora Defendants' conclusory characterizations of Plaintiff's behavior are particularly unhelpful as they offer only their conclusions--which is the very subject of the dispute--rather than providing insight into the events that transpired.  In other words, the Court will not find that Plaintiff exhibited "aggressive" behavior merely because the Ancora Defendants have said so.

Brandt, 626 F.Supp.2d at 481 (emphasis added).

> The Court cannot hold, based on the evidence before it, that a reasonable person in the Ancora Defendants' position would have perceived an emergency.  This inquiry turns on what behavior Plaintiff actually displayed in the treatment team meeting.  From the evidence on the record, it is just as likely that Plaintiff displayed aggressive and violent behavior giving rise to a reasonably perceived emergency, as it is that Plaintiff expressed his frustration with such non-threatening, commonplace behaviors as raising one's voice, leaving the room, and moving closer to one's disputant.  To resolve this factual dispute, the Court would have to make a credibility determination about such factors as whether or not Plaintiff was yelling and flailing his hands, as Monte testified in her deposition. The Court is unable to make such a determination on a written record alone.  As the decision of whether the Ancora Defendants reasonably perceived an emergency is contingent upon the credibility-centered factual determination of what circumstances they confronted, the Court cannot decide the legal issue without first resolving the factual dispute.

Id. at 483-84.  The same holds true with respect to the case at bar.

Next, the Brandt Court reviewed plaintiff's claim that the emergency procedures violated his procedural due process rights.  In this regard, plaintiff alleged four constitutional deficiencies: 1) lack of post-deprivation hearing; 2) lack of periodic reviews during the term of drug administration; 3) no requirement that the administering doctor consider lesser-intrusive measures; and 4) administration of medication when the emergency is "reasonably foreseeable," rather than "imminent."  Applying the three-part Mathews test as utilized in Harper, the Court concluded that

when a patient is medicated against his will pursuant to an emergency declaration, he is entitled to an intra-administrative post-deprivation hearing and periodic reviews during the term of drug administration.  Because Plaintiff did not receive these safeguards, he asserted a violation of his due process rights.  <u>Brandt</u>, 626 F.Supp.2d at 488.

Next, the Court concluded that pursuant to <u>Rennie</u>, due process required that, in an emergency, antipsychotic drugs may be constitutionally administered only when "such an action is deemed necessary to prevent the patient from endangering himself or others.  Once that determination is made, professional judgment must also be exercised in the resulting decision to administer medication."  <u>Brandt</u>, 626 F.Supp.2d at 488 (quoting <u>Rennie II</u>, 720 F.2d at 269-70).  This two-part standard requires first, that a doctor must deem involuntary medication necessary to avert an emergency, and second, he may medicate the patient only if consistent with professional judgment, which necessarily requires the medical authorities to have considered lesser-intrusive alternatives.  *Id*. at 489.

Similarly, Plaintiff alleges that Dr. Petras involuntarily medicated him without considering lesser-intrusive measures and in the absence of a reasonably impending emergency.  Moreover, he was continued on medication for three days without any post-deprivation hearing.  Because there are factual issues that cannot be resolved on this record, neither Plaintiff nor Dr. Petras is entitled to summary judgment as to Plaintiff's due process claims.

III.  **<u>CONCLUSION</u>**

For the reasons set forth above, it is respectfully recommended that the Motion for Summary filed by the Commonwealth Defendants (doc. no. 132) be granted, that the Motion for Summary

Judgment filed by Defendant Dr. Petras (doc. no. 218) be denied and that Plaintiff's Cross Motion for Summary Judgment (doc. no. 144) be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(A), and Rule 72.C.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of issuance of this Order to file an  appeal to the District Judge, which includes the basis for objection to this Order.  Any party opposing the appeal shall have fourteen (14) days from the date of service of the notice of appeal to respond thereto.  Failure to file a timely notice of appeal may constitute a waiver of any appellate rights.

Dated: May 28, 2010

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc:    Eric M. Miskovitch
       DA 5989
       SCI Camp Hill
       PO Box 200
       Camp Hill, PA 17001